AMELIA GALL, Respondent, *v.* CHARLES F. GALL et al., Appellants.

A mutual agreement between competent parties to take each other for husband and wife constitutes a valid marriage, even if not in the presence of witnesses.

Such a marriage may be proved by showing actual cohabitation as husband and wife, acknowledgment, declarations, conduct, repute, reception among neighbors and relations, etc.

Where it appears that the intercourse was illicit at first, but was not accompanied by any of the evidences of marriage, and subsequently it assumed a matrimonial character and was surrounded by the evidences of a valid marriage above named, a question of fact is presented for the determination of a jury.

The provision of the Revised Statutes (2 R. S. 139, § 6) permitting a person already married to marry again, where the former husband or wife has absented himself or herself for five successive years without being known by such person to be living during that time, and declaring the second marriage to be void only from the time its nullity shall be pronounced by a court of competent jurisdiction, is based upon the probability that in such case the absentee is dead, and is designed to protect the person, who, in good faith, acts upon the statute.

The mere fact that a wife has absented herself for five years, and that her husband has not heard from her in that time, does not justify him in marrying again; it must appear that he acted as a reasonable man desiring to act in good faith would have acted under the circumstances.

Where, therefore, it appeared that a wife left her husband shortly after marriage, which occurred in 1865, and articles of separation were signed by them; that he never saw her afterward and believed the articles of separation were a divorce; that he heard she was dead in 1870; that he married again in 1871; that his former wife was living in 1873; that he

never, except on one occasion, inquired to ascertain where she was, although he continued to live in the same neighborhood with her relatives and was acquainted with some of them; that he told his second wife, both before and after he married her, that his former wife was living, but that he had a divorce from her, *held*, the evidence justified a conclusion that the man in marrying again did not act in good faith; and so that the second marriage was void.

Where a court has received improper evidence in a civil action, under objection and exception, it may remedy the error by striking out the evidence of its own motion.

*Erben* v. *Lorillard* (19 N. Y. 299); *People* v. *Smith* (104 id. 491) distinguished.

(Argued March 14, 1889; decided April 16, 1889.)

APPEAL from judgment of the General Term of the Supreme Court, in the second judicial department, entered upon an order made December 13, 1887, which affirmed a judgment in favor of plaintiff, entered upon the verdict of a jury, and affirmed an order denying a motion for a new trial.

This was an action to admeasure dower. The plaintiff, in her complaint, alleges " that she is the widow of Joseph Gall, deceased." The denial of this allegation by the defendants, Charles F. Gall and others, raised the only material issue of fact in the action.

The facts, so far as material, are stated in the opinion.

*John E. Parsons* for appellants. To bring the fact that Lena Pfeiffer absented herself from Jerman for more than five years, within the statute, all that was required was good faith on Jerman's part. Good faith did not require Jerman to hunt for her. (*Jones* v. *Zoller*, 29 Hun, 551, 554; 32 id. 280, 283.) The fact that Jerman did marry the plaintiff is of itself conclusive of his good faith. The presumption is that he would not commit a crime. (1 Greenleaf on Evidence, § 35; *Clayton* v. *Wardwell*, 4 Comst. 230, 237; *Nesbit* v. *Nesbit*, 3 Dem. 329.) Jerman's knowledge that Lena was alive was a fact, and this fact could not be proved by the mere declaration of Jerman himself. (*Gandolpho* v. *Appleton*, 40 N. Y. 533, 538–540; *Gardner* v. *Barden*, 34 id. 433, 438; *Paige* v. *Cagwin*, 7 Hill, 361, 368; *Phillips* v. *Thompson*, 1 Johns. Ch. 131, 139; *Benjamin* v. *Smith*,

4 Wend. 332, 336; *Woodward* v. *Paine*, 15 Johns. 493; *Wiggins* v. *People*, 4 Hun, 540, 543.) The intent or belief under which plaintiff left Jerman, in 1875, was no part of the *res gestæ* of her marriage to him in 1871, and did not form the motive of any act of his or her inducing that marriage. The naked fact that she left him in 1875 proves nothing and is wholly immaterial, and the alleged belief that influenced that act cannot be said to be more material than the act itself. (*Brown* v. *Champlin*, 66 N. Y. 214, 221; *McCormack* v. *Perry*, 47 Hun, 71, 74; *Nichols* v. *K. I. O. Co.*, 56 N. Y. 618; *Schultz* v. *T. A. R. Co.*, 89 id. 242, 250; *Morgan* v. *Frees*, 15 Barb. 352; *Briggs* v. *Wheeler*, 16 Hun, 583, 584; *Burns* v. *City of Schenectady*, 24 id. 10; *Marston* v. *Gould*, 69 N. Y. 220, 228; *Church* v. *Howard*, 79 id. 415, 421; *Dilleber* v. *Home Life Ins. Co.*, 69 id. 256, 260; *Vallean* v. *Vallean*, 6 Paige, 207–209; *McCallan* v. *Brooklyn C. R. R. Co.*, 48 Hun, 340; *Stokes* v. *People*, 53 N. Y. 164, 176; *Harris* v. *Wilson*, 7 Wend. 57, 62; *Bush* v. *Hewitt*, 4 N. Y. Leg. Obser. 384; *Moore* v. *Hitchcock*, 4 Wend. 292; *Paige* v. *Cagwin*, 7 Hill, 361, 368, 369; *Gardner* v. *Barden*, 34 N. Y. 433, 438; *Gandolfo* v. *Appleton*, 40 id. 533, 538, 539, 540; *Hill* v. *Burger*, 3 Bradf. 454; 2 R. S. 143, § 30; *Badger* v. *Badger*, 88 N. Y. 546, 556, 558; *Van Tuyl* v. *Van Tuyl*, 57 Barb. 241; 9 Paige, 614; *Meichum* v. *State*, 11 Ga. 615; Starkie on Ev. [8th Am. ed.] 89; *Clayton* v. *Wardell*, 4 N. Y. 230; *Jewell* v. *Jewell*, 1 How. [U. S.] 219, 230; *Montgomery* v. *Montgomery*, 3 Barb. Ch. 132; Abb. Tr. Ev. 81, 82, § 19; *In re Taylor*, 9 Paige, 611, 616; *Shedden* v. *Patrick*, 30 L. J. P. M. & D. 217–223; *Erben* v. *Lorillard*, 19 N. Y. 299, 302, 303; *Anderson* v. *R. W. & O. R. R. Co.*, 54 id. 334, 341; *O'Sullivan* v. *Roberts*, 39 N. Y. Supr. Ct. 360; *Waldele* v. *N. Y. C. & H. R. R. R. Co.*, 95 N. Y. 274, 280; 17 Abb. N. C. 502.)

*A. Simis, Jr.*, for respondent. Proof of matrimonial cohabitation, declaration of the parties and reputation that

they are man and wife, is sufficient upon which to found a a presumption of marriage. The courts of this state have gone very far in indulging such a presumption from cohabitation and reputation. (*Betsinger* v. *Chapman*, 88 N. Y. 499; *Badger* v. *Badger*, Id. 546, 254; *O'Gara* v. *Eisenlohr*, 38 id. 296; *Hynes* v. *McDermott*, 91 id. 451, 457, 459; *Fenton* v. *Reed*, 4 Johns. 52; *Piers* v. *Piers*, 2 H. of L. Cas. 331; *De Thoren* v. *Attorney-General*, L. R., 1 App. Cas. 686; *Rose* v. *Clark*, 8 Paige, 572; *Starr* v. *Peck*, 1 Hill, 270; *Jackson* v. *Claw*, 18 Johns. 346; *Canjolle* v. *Ferrie*, 23 N. Y. 554; *Vermilyea* v. *Palmer*, 52 id. 476.) As between Jerman and Lena Pfeiffer, the former's subsequent marriage to plaintiff is voidable; as between the plaintiff and Jerman their marriage is void. (2 R. S. 138, §§ 5, 6; *Kinzey* v. *Kinzey*, 7 Daly, 461, 463; *O'Gara* v. *Eisenlohr*, 38 N. Y. 301; *Downs* v. *N. Y. C. R. R. Co.*, 56 id. 664.) "Reputation," in its application to the fact of marriage, is more than mere hearsay; it involves and is made up of social conduct and recognition, giving character to an admitted and unconcealed cohabitation. (*Badger* v. *Badger*, 88 N. Y. 556.) Plaintiff had a right to rely upon Jerman's representation that he had been divorced. (*Blossom* v. *Barrett*, 37 N. Y. 436; *Courtland* v. *Herkimer Co.*, 44 id. 22.) Plaintiff's marriage to Jerman being a nullity, her failure to disclose the marriage to Mr. Gall would not be a fraud to vitiate her marriage contract with him. (1 Bishop on Mar. and D. § 176.)

VANN, J. By this action, the plaintiff alleging that she was the lawful wife of one Joseph Gall, deceased, sought to recover dower in the lands of which he died seized. As she made no effort to prove a ceremonial marriage between herself and Mr. Gall, the decision of the issue turned primarily upon the inference to be drawn from certain acts and declarations of the parties and their marital reputation among their acquaintances.

The competency of the plaintiff to contract marriage with Mr. Gall was questioned upon the ground that she had been

previously married to one John Jerman, who was still living, undivorced, at the time of the trial. It was conceded that she had no right to marry Mr. Gall, provided her marriage to Mr. Jerman was valid. This depended upon the competency of Jerman to marry, as he had a living wife, Helena, from whom he had not been divorced· at the time he married the plaintiff. The competency of Jerman to marry the plaintiff rested upon that provision of the Revised Statutes which permits a man, already married, to marry again, provided his former wife shall have absented herself for the space of five successive years without being known to him to be living during that period. (3 R. S. [7th ed.] 2332, § 6.)

Thus upon the trial there arose three questions of fact, which were submitted to a jury for decision in the following form :

1. Did Helena Jerman, the first wife of John Jerman, absent herself for the space of five years prior to the marriage of Jerman to the plaintiff, within the meaning of the statute upon that subject ?

2. Was said Helena Jerman known to John Jerman to be living during the period of five years immediately preceding his marriage to the plaintiff ?

3. Did the plaintiff and Joseph Gall, deceased, at any time between the month of February, 1883, and the decease of said Gall intermarry ?

The jury after answering the first question in the negative, and the second and third in the affirmative, found a general verdict for the plaintiff.

The first question presented for decision is whether, within the rules governing appeals to this court, there was sufficient evidence to support the findings of the jury. The determination of this question requires a somewhat extended examination of the facts as the jury may be presumed to have found them.

Joseph Gall died May 22, 1886, in the eighty-second year of his age. He married in early life, and his wife, after living

with him for many years, died on the 23d of February, 1883, leaving no children. The plaintiff, under the name of Amelia Stieb, was employed in the family as an ordinary servant from 1877 until the death of Mrs. Gall, and after that event she continued to serve Mr. Gall for a time in the same capacity at his residence, No. 4 Rutherford place, in the city of New York. During this period the outward relations, at least, between Mr. Gall and the plaintiff were simply those of master and servant. She cooked his meals and kept his house, but did not sit at his table nor, apparently, have any unusual privilege. During the spring or summer of 1883, however, a criminal intimacy sprang up between them, and in the fall, believing that she was pregnant by him, he requested his physician to make a physical examination, which resulted in the discovery that she was with child. He thereupon gave up his establishment at No. 4 Rutherford place and took rooms at the Westminster Hotel, while she removed to a tenement-house where he supported her and furnished her with a servant. In February, 1884, the plaintiff was delivered of a daughter, of whom he acknowledged in many ways that he was the father. In May, 1884, he moved her to a house in Brooklyn, recently purchased by him for the purpose, where she lived with her mother, brother and sister, all supported by him.

He stated at the time, to one person, that he bought this house for his wife and child, and to another that he bought it for his family. Previously he had called plaintiff's mother "Mrs. Stieb," but after this he habitually called her "mother," and once told her that the plaintiff was his wife. In May, 1884, he went to Europe, returning in July, when he resumed his rooms at the Westminster, and thereafter, until March, 1886, he visited the plaintiff at the house in Brooklyn from one to three times a week, generally remaining over night, and usually from Saturday evening until Monday morning. They occupied the same bed, ate at the same table, and all of their apparent relations were those of husband and wife.

From the time the plaintiff began to live in the Brooklyn

house until the date of his death, he treated her in that locality as his wife, and she was reputed in that neighborhood to be his wife. He introduced her as such to the neighbors; spoke to her and of her to servants and others having business in the house as his wife; referred mechanics to "Mrs. Gall" for further particulars in making repairs that he had ordered; directed plumbers to do whatever his wife ordered and said that he would pay for it; and said to plaintiff's sister and her husband, as he gave them a present on their wedding anniversary, "this is a small present from myself and wife." On one occasion Mr. Gall, the plaintiff, and the child were at Rockaway Beach, and as he was dancing around with the child the people were making remarks about it, and asked him whether that was his child, when he answered "yes, that is my child and there is my wife." A few months before his death he said to his partner in business that he was not going to Europe that year because he expected an increase in the family, and, on being asked if he was actually married to the plaintiff, said that he had taken legal advice on the matter and that according to the laws of the state of New York he was married to her. When urged, on the same occasion, to have a ceremony performed for the sake of the children, "one living, one coming," he said that he did not care to make his private affairs public. In March or April, 1886, he left his rooms at the hotel and moved his furniture to the house in Brooklyn, stating. that he went there to reside permanently and thenceforward he did reside there until his death.

It was conceded that while Mr. Gall was at the Westminster Hotel he lived by himself without any relations to the plaintiff or her family, so far as his life there was concerned.

His old acquaintances, many of them persons of position, supposed that he was a widower. Aside from his business partner he does not appear to have told any of them that the plaintiff was his wife. Only one other of his old friends, however, seems to have known that he cohabited with her, and he said nothing to him upon the subject, although he was the physician employed by Mr. Gall to attend the plaintiff

upon the birth of the child.  To a few of his old acquaint-
ances, who did not know of his intimacy with her or that he
had had a child by her, he spoke of the plaintiff as his cook
or his housekeeper.  He did not take her to see his relatives
or old friends or to the places which he frequented.  On one
occasion when joked about getting married again, he said that
he would not marry the best woman who ever trod in shoe-
leather; and on another, that he would not marry the best
girl that ever lived.  To one person he said that he was a
married man, but his wife was dead; and to another, about
six weeks before his death, that he should never marry again.
He made other declarations of like character, but none of the
persons to whom these statements were made appear to have
known of the plaintiff's existence.

Prior to leaving Rutherford Place on the 1st of January,
1884, the plaintiff disclaimed being Mrs. Gall.  She did not
attend the funeral of Mr. Gall, but she was advised not to on
account of her condition, being that of advanced pregnancy.
The second child, also a daughter, was born in July, 1886,
about two months after the death of Mr. Gall, who, before he
died, said that he was the father of the unborn child.

In October, 1882, Charles Funckenstien, a nephew of
Mr. Gall, came from California at his request, to live with
him.  In April, 1883, by due course of procedure, the name
of Mr. Funckenstien was changed, at his uncle's desire,
to Charles F. Gall, and thereafter he was known as the
adopted son of Joseph Gall.  April 3, 1883, Mr. Gall made
his will, in which he directed that his body should be buried
by the side of his beloved wife Elizabeth Ann, and after
making certain bequests, gave all the rest of his property to
his nephew Charles Funckenstien.  April 28, 1884, by a
codicil to said will, he bequeathed $1,000 to " Amelia Stieb,
servant of my late wife," and $5,000 " to the child of said
Amelia, Betsey A. Gall, now of the age of two months."

In August, 1871, the plaintiff was married to John Jerman,
knowing that he had been married before, but believing that
he was divorced.  She lived with him until 1875, when,

learning that he had not been divorced, she left him. Jerman was married to Helena Pfeiffer on October 28, 1865, and lived with her about two weeks, when she left him. Six months later he found her in a house of assignation, and shortly afterward they met at the office of a lawyer, who prepared articles of separation which they signed in the presence of witnesses and each took a copy. He never saw her again, but believed that the articles of separation were a divorce. In 1870 he heard that she was dead. In fact she was living as late as 1873, two years after his marriage to the plaintiff, and was seen during that year in Indianapolis and New York. She was also seen in New York in 1866, about one year after the separation, but, except as mentioned, she seems to have "disappeared entirely out of her former family relations." She led a loose life and wandered from place to place. Jerman never inquired to find out where she was, except on one occasion, when he asked an acquaintance, who said that he did not know anything about it. He continued to live in the same neighborhood as when he married Helena and knew her brothers and sisters, her aunt and cousin and others of her relations, and where some of them lived. He heard once that her family had moved west, but made no effort to find out about them or about her. He told the plaintiff, both before and after he married her, that Helena was living, but that he had a divorce from her. There was some conflict in the evidence. The plaintiff and some of her witnesses were somewhat discredited, but as all questions of credibility were exclusively for the jury, they were warranted in finding the facts as already stated.

Did these facts authorize the jury to draw the final inferences necessary to uphold their verdict?

The cohabitation, apparently decent and orderly, of two persons opposite in sex, raises a presumption of more or less strength that they have been duly married. While such cohabitation does not constitute marriage, it tends to prove that a marriage contract has been entered into by the parties. Where, however, the cohabitation is illicit in its origin, the

presumption is that it so continues until a change in its character is shown by acts and circumstances strongly indicating that the connection has become matrimonial. It is sufficient if the acts and declarations of the parties, their reputation as married people and the circumstances surrounding them in their daily lives, naturally lead to the conclusion that, although they began to live together as man and mistress, they finally agreed to live together as husband and wife. (*Caujolle* v. *Ferrie*, 23 N. Y. 90; *O'Gara* v. *Eisenloher*, 38 id. 296; *Badger* v. *Badger*, 88 id. 546, 554; *Hynes* v. *McDermott*, 91 id. 451, 457.)

A present agreement between competent parties to take each other for husband and wife constitutes a valid marriage, even if not in the presence of witnesses. (*Clayton* v. *Wardell*, 4 N. Y. 230; *Caujolle* v. *Ferrie, supra; Brinkley* v. *Brinkley* 50 id. 184, 197.) Such a marriage may be proved by showing actual cohabitation as husband and wife, acknowledgment, declarations, conduct, repute, reception among neighbors and relations and the like. And where the intercourse was illict at first, but was not then accompanied by any of the evidences of marriage, and subsequently it assumes a matrimonal character, and is surrounded by the evidences of a valid marriage above named, a question of fact arises for the determination of the jury. They are to weigh the presumption arising from the meretricious character of the connection in its origin with the presumption arising from the subsequent acknowledgment, declarations, repute, etc., and decide whether all of the circumstances taken together are sufficient evidence of marriage.

The application of these principles to the facts of this case leaves no doubt that the jury was warranted in finding that the plaintiff and Mr. Gall were married. The only evidence of the time when their intercourse began is the pregnancy of the plaintiff, discovered in August or September, 1883. They were not then living together as husband and wife, but as master and servant. She did not sit at his table nor, so far as was known, sleep in his bed. They had not held themselves

out as married, nor made any acknowledgment or declaration upon the subject. Neither their conduct nor reputation in any way indicated a married relation. The connection was purely licentious, and its only effect was to destroy the presumption of innocence when they began to openly cohabit.

Contrast this state of affairs with that which existed just before the death of Mr. Gall. They were then openly living together as husband and wife, and were recognized as such by the mother, brother and sisters of the plaintiff, by the physician, the neighbors and by all who had either social or business relations with them. A child had been born to them, who bore his name, at whose baptism he was present, and whom in every way he acknowledged as his daughter. Neither of them had any home other than that where they openly lived together with their child as a family. He called her his wife in the presence of others, said she was his wife in her absence and told his old partner in business that according to law they were married. He volunteered to acknowledge both wife and child when there was no occasion to say anything to save appearances. All of the circumstances surrounding them tended to show that they were married. One fact which affected him only, and hence was immaterial, was inconsistent with the presumption of marriage. He passed as unmarried with his old friends and acquaintances, possibly because he did not wish them to know that he had married his cook. But it was held in *Badger* v. *Badger* (*supra*), that evidence of divided repute must be confined to those who have knowledge of the cohabitation, and that proof that a man was reputed to be unmarried, given by his friends, who knew nothing of the putative wife or of the fact of cohabitation, was mere hearsay. The reputation of Mr. Gall at the Westminster Hotel, therefore, did not tend to explain the character of his cohabitation with the plaintiff.

The competency of the plaintiff to marry Mr. Gall is an important question, depending upon the competency of Jerman, her first husband, to marry her, as he had a living wife. The statute covering the subject is as follows, viz.: "If any

person whose husband or wife shall have absented himself or herself for the space of five successive years, without being known to such person to be living during that time, shall marry during the lifetime of such absent husband or wife, the marriage shall be void only from the time that its nullity shall be pronounced by a court of competent authority."

Assuming that the declaration of Jerman that his first wife was alive was incompetent evidence to establish the fact that she was not known to him to be living during the statutory period, still, as no objection was made, it was not error to receive it. The defendants, however, insist that there was no other evidence upon the subject, and that a verdict resting only upon incompetent evidence, even if received without objection, should not stand. But, as Jerman's first wife was, in fact, alive at the time that he married the plaintiff, the question of fact still remained whether he acted in good faith in contracting a second marriage. The section quoted seems to be based upon the probability that the absentee is dead, and is apparently designed to protect the person who, in good faith, acts upon the statute, from evil results if the absentee is actually living. The first marriage is suspended, or, as was held in *Griffin* v. *Banks* (24 How. 213), it is "placed in abeyance," but it is not reinstated by the return of the absentee, because the second marriage becomes void only from the time that it is so declared by a competent court. Otherwise both marriages would be in force at the same time and, to this extent, polygamy would be sanctioned by law. The first marriage ceases to be binding until one of the three parties to the two marriages procures a decree pronouncing the second marriage void. (3 R. S. [6th ed.] 142, §§ 36, 37; Code of Civ. Pro. § 1745.) A statute with such possibilities should be so construed as to promote good order, and the person availing himself of its privilege should be required to act in perfect good faith. (*Jones* v. *Zoller*, 32 Hun, 280, 282; *Cropsey* v. *McKinney*, 30 Barb. 47; *McCartee* v. *Camel*, 1 Barb. Ch. 455, 464.) He decides the question as to his right to remarry for himself, without application to any court or public authority. The whole responsi-

bility rests upon him.  He cannot shut his eyes and ears and justify a second marriage because for five years he did not hear of his wife.  Did he try to hear of her?  Did he honestly believe she was dead?  Did he make inquiry?  Were the circumstances such that a reasonable man, honestly desiring to learn the truth, would have made inquiry?  Was he excused from inquiring by a false report of her death?  Questions of this character are involved in the ultimate question of good faith, which is necessarily for the jury, as it depends upon the inferences to be drawn from a great many circumstances.

In this case it was their duty to determine whether Jerman, in deciding that he had the right, relying upon the statute, to marry again, acted as a reasonable man, desiring to act in good faith, would have acted under the same circumstances. Whether he relied upon his supposed divorce, or upon the report that his wife was dead, instead of upon the statute, was for the jury to say.  They were also to consider his opportunity for making inquiries and the effect of his omission to do so. The facts warranted their conclusion that he did not act in good faith, and hence that his marriage to the plaintiff was void.

We have examined the exceptions relating to evidence and find but one that requires attention.  The court received in evidence, against objection and exception, the inscription " J. G. to A. S." upon a ring proved to have been worn by the plaintiff in the spring of 1883, but which the testimony did not connect with Mr. Gall.  The court, of its own motion, struck the evidence out and excluded the ring.  We do not think this was error.  The evidence was stricken out immediately after it was received and before it had had time to produce any permanent impression upon the minds of the jury. Even when great care is used upon a trial, incompetent evidence will occasionally creep in.  A witness may make a voluntary statement, or an answer that is not responsive, or the trial judge may admit something the exact bearing of which he fails at the moment to perceive.  Cannot this be remedied

by striking it out? Must the court stop in the midst of a long trial and discharge the jury because it is possible that the jurors, in violation of their duty, may give heed to evidence which is no longer in the case, but which was promptly struck out in their presence? Such a rule would seriously impede public business and lead to needless multiplication of trials. It would be opposed to the modern tendency both of legislation and judicial decisions. (*Platner* v. *Platner*, 78 N. Y. 90; *Pontius* v. *People*, 82 id. 339.)

We are referred to *Erben* v. *Lorillard* (19 N. Y. 299), but in that case the incompetent evidence was not struck out, although the judge in charging the jury told them to pay no attention to it. In *People* v. *Smith* (104 N. Y. 491), a capital case, the danger of prejudice to the defendant was much greater than it was in the case under consideration. While it is the better practice, in addition, to striking out the evidence, to carefully instruct the jury to disregard it, still as no request was made that this should be done, the defendant cannot predicate error upon that omission.

The judgment should be affirmed.

All concur, except HAIGHT and PARKER, JJ., dissenting, and BROWN, J., not voting.

Judgment affirmed.