(84 Misc. Rep. 264)

## SPENCER v. SPENCER.

(Supreme Court, Special Term, New York County. February, 1914.)

1. MARRIAGE (§ 50*)—COMMON-LAW MARRIAGE—CONSUMMATION—SUFFICIENCY OF EVIDENCE.

Evidence, in an action for a separation, *held* insufficient to show a common-law marriage between plaintiff and defendant, where, pending illicit relations, plaintiff contracted a ceremonial marriage with another.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. § 50.*]

·2. MARRIAGE (§ 31*)—"MARRIAGE CERTIFICATE."

A "marriage certificate" is an instrument which certifies a marriage, and is executed by the person officiating at the marriage; it is not intended to be signed by the parties.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 44; Dec. Dig. § 31.*]

3. MARRIAGE (§ 40*) — COMMON-LAW MARRIAGE — PRESUMPTION FROM ILLICIT RELATION.

A relationship illicit in its inception is presumed to continue as such, and does not give rise to a presumption of a common-law marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. § 40.*]

Action by Clara Spencer against George F. Spencer, for separation. Complaint dismissed.

Greenthal & Greenthal, of New York City, for plaintiff.
Richard E. Weldon, of New York City, for defendant.

COHALAN, J. [1] Action for a separation. The plaintiff is in doubt as to whether or not she is in fact the lawful wife of the defendant, and this suit is brought to have her status definitely determined. The record shows that the parties hereto have not only a contempt for the forms of marriage, but even a disregard for the ordinary decencies of life. The facts for the most part are conceded, and disclose a remarkable situation. It appears that the plaintiff and the defendant first met in September in the year 1887, and almost immediately entered into illicit relations. The plaintiff asserts that there was an agreement to marry; the ceremony to take place at

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Christmas time in that year. It is not disputed that they lived together from September until the 24th day of December, 1887; yet during that time no marriage ceremony occurred. The defendant was following a career of crime, and on the 24th day of December, 1887, he was convicted of an offense against the law and was sentenced to a term of years in a penal institution. After his release therefrom the parties during the years of 1892 and 1893 renewed the illicit relationship. The defendant was again convicted of crime, and, after serving his second sentence, once more lived in the same manner with the plaintiff in the years 1898 and 1899. For the third time the defendant ran counter to the law and was deprived of his liberty. It is the plaintiff's claim that during these respective periods no marriage ceremony was performed, because the defendant refused to marry her by a clergyman of her own faith. The defendant asserts that he refused to marry the plaintiff because of the fact that he was leading a criminal life. In the meantime the plaintiff, who had become an actress, married, on the 27th day of June, 1900, by a ceremonial marriage one John Walsh, with whom she lived for three years. After obtaining his final freedom from prison, the defendant took up his abode in the Walsh home. For about a year therein the plaintiff sustained the double role of wife to Walsh and of mistress to the defendant Spencer. In 1903 Walsh left the plaintiff, and his present whereabouts are not disclosed by the evidence. Thereafter the plaintiff and the defendant continued to live together, and for ten years, in more or less turmoil, have so lived as husband and wife. There are two other facts to be noted in this sordid record: (1) That the defendant has recast his life, and now, as a consequence of his reform, occupies a position of trust with a public service corporation; and (2) that there is no issue of the respective alliances formed by the plaintiff. The plaintiff now asserts a common-law marriage, and claims: (a) That it is established by her cohabitation with the defendant prior to 1900; (b) that some sort of a written agreement was entered into between the parties in December, 1887; and (c) that, as a consequence of the foregoing, her marriage to Walsh was a nullity and a bigamous venture. It may be that there would have been sufficient evidence in the case, if the marriage to Walsh had not intervened, to have decreed a valid common-law marriage. Gall v. Gall, 114 N. Y. 109, 21 N. E. 106; Badger v. Badger, 88 N. Y. 546, 42 Am. Rep. 263; Matter of Hamilton, 76 Hun, 200, 27 N. Y. Supp. 813. Common-law marriages were legal prior to the enactment of chapter 339 of the Laws of 1901, when these marriages were expressly prohibited by statute. It is conceded that the defendant in various ways held the plaintiff out as his wife, particularly after her abandonment by Walsh. But the important issue for ultimate decision in this case is whether or not the plaintiff contracted a bigamous marriage with Walsh on the 27th day of June, 1900. If she did not, it matters not so much on the main question what occurred after that date. I do not find that any formal agreement of marriage was ever entered into by the plaintiff and the defendant. The plaintiff testified that, while the defendant was confined in the city prison, a marriage certificate was prepared and signed by the defendant; that

a minister's name was filled therein; and that such a paper was left with the defendant. While much reliance is placed upon this paper as a proof of a marriage contract, yet the plaintiff refused to say that she had signed it. The defendant, while admitting that a paper had been prepared and was intended for the purpose of permitting the plaintiff to represent herself as his wife, testified that it was not a marriage agreement, and denied that he ever signed any such paper.

[2] A "marriage certificate" is an instrument which certifies the marriage, and is executed by the person officiating at the marriage; it is not intended to be signed by the parties. If so signed, it would be a circumstance tending to affect its authenticity, and it would be nullified by the forgery of the minister's name. She claims that this paper was left with the defendant, who was about to be sent away to serve a long prison sentence. It is more probable that, if it existed, it was turned over to the plaintiff for the purposes for which it was prepared. It could be of assistance to the plaintiff; it could be of little avail to the defendant. The most that may be said of this paper is that it was further evidence of a holding out of the plaintiff as his wife by the defendant, and there is no dispute that, for illicit purposes, he did so hold her out. Despite her assertion that such a paper confirmed a common-law marriage agreement, its value as proof is weakened by the fact that the plaintiff testified that, subsequently to the time that it was made out, she frequently urged the defendant to marry her. However, assuming that the defendant acted in good faith with regard to the alleged certificate, and that he was willing to recognize the plaintiff as his wife, it cannot be doubted that she had the legal right to regard the relationship as illicit, and she might end it whenever her choice so dictated. She made an election to so terminate it and entered into lawful wedlock with Walsh. When she contracted the ceremonial marriage, she alleged that she used the name of "Clara Spencer," and that the officiating clergyman knew all about her and her antecedents. Yet the marriage certificate contained her maiden name, "Clara Barrett." On either horn of the dilemma, the plaintiff is concluded. If she used the name of "Spencer," it is obvious that this clergyman, having known her and her people, would certainly inquire into the reasons for her use of that name, and after such inquiry he must have been satisfied that she was eligible to assume the obligation of marriage and that he was justified in performing the ceremony. It is manifest that this clergyman would not deceive her. In fact, no clergyman in possession of the facts would regard the defendant's imprisonment as an annulment or as creating a widowhood which would permit the plaintiff to remarry. If she used her maiden name, "Barrett," it shows that she considered herself a single woman, and that she was not bound by a contract of marriage to the defendant; and, if she had ever claimed rights under such a contract, she had by such ceremonial marriage rejected them. A satisfactory test of the sufficiency of this ceremonial marriage might be based on this assumption: If, when the defendant returned in 1903, he should have seriously demanded that the plaintiff should live with him as his lawful wife, would such a demand have been recog-

nized, and would she have been compelled to give up Walsh? If, under these circumstances, she contended that she was living in lawful wedlock with her husband, there is no question but that her position would have been sustained. And this is precisely what she did, as is shown by her conduct. She maintained her marital relations with Walsh and maintained other relations with defendant. Moreover, the plaintiff on the 5th day of October, 1911, executed an agreement with the defendant providing for her support under the name of "Clara Walsh," and she also wrote a letter to the officials of the Pennsylvania Railroad Company, in which she stated that they knew her position was not that of the wife of the defendant.

[3] The presumption of law is that a relationship, illicit in its inception, continues as such. Caujolle v. Ferrie, 23 N. Y. 90; Badger v. Badger, 88 N. Y. 546, 42 Am. Rep. 263; Newton v. Southworth, 7 N. Y. St. Rep. 130. In the case of Badger v. Badger, supra, the rule is stated as follows:

"The rule that a connection, confessedly illicit in its origin, or shown to have been such, will be presumed to retain that character until some change is established is both logical and just. The force and effect of such a fact is always very great, and we are not disposed in the least degree to weaken or disregard it."

It is conceded that this connection was illicit in its origin. There was an agreement to marry according to the plaintiff, but, before the marriage was consummated, there was cohabitation. No evidence of an executed contract of marriage appears in the case. There may be evidence of an executory contract to marry in the future, but that is not sufficient. Before an agreement to marry was executed, the plaintiff changed her status and became a legally married woman.

In the case of Newton v. Southworth, supra, the parties lived and cohabited together, and in the community in which they lived held themselves out for 30 years as man and wife; moreover, they had five children born to them. It was held that there was enough evidence in the case to found a presumption of marriage, if there was nothing therein to repel such a presumption. Within a year after they had ceased to live together, the man ceremonially married another woman, and later the first-mentioned woman contracted a marriage with another man. The court said:

"It has been said that the presumption of marriage, from cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. * * * And the presumption could be dispelled only by the most cogent and satisfactory evidence. Hynes v. McDermott, 91 N. Y. 451, per Andrews, J., 459, 43 Am. Rep. 677, and cases there cited. The countervailing evidence in this case, we think, meets the requirements of that rule. In 1863 Harrison and Lydia voluntarily separated and ceased to live together. In July, 1864, Harrison married the respondent, Laura A. Harrison, and in July, 1865, Harrison being then living, Lydia married John A. Southworth, and, if Lydia was the lawful wife of Harrison, each of such marriages was bigamous. But the law presumes against the commission of crime, and that presumption stands opposed in this case to the presumption against illicit intercourse and neutralizes it. As was said by Gilbert, J., in Foster v. Hawley, 8 Hun, 68, 72: 'We canot raise a presumption of a contract of marriage when the direct consequence of so doing would be to involve both parties to it in the crime of bigamy.' "

In the case of Chamberlain v. Chamberlain, 71 N. Y. 423, the question in controversy was whether one Chamberlain was lawfully married to Effie Porter or to Sally Keyes. He lived with the former for many years as his wife. It was shown that Chamberlain called her his wife and treated her as such while they lived together, and said, even after they had separated, that he was married to her. The court said:

"All this evidence, if there had been no countervailing evidence, would have been ample to show a marriage."

However, Chamberlain thereafter contracted a ceremonial marriage with Sally Keyes. Effie Porter acquiesced apparently, and recognized by so doing that her relationship was illicit and not matrimonial in its nature. The court held that, while the evidence given to show a marriage with Effie Porter was sufficient to make out a prima facie case of marriage, it was overcome by the opposing evidence of a ceremonial marriage, and that Chamberlain was lawfully married to Sally Keyes.

In the case of Jenkins v. Jenkins, 83 Ga. 283, 9 S. E. 541, 20 Am. St. Rep. 316, the rule applicable to this case is stated as follows:

"The true doctrine of the authorities is that where two alleged marriages compete, and one of them is proved as a fact, whether by direct or circumstantial evidence, the other cannot be left to stand upon the mere presumption founded on cohabitation and repute. * * * With no competing actual marriage proved, the law presumes marriage from cohabitation and repute. But this presumption the law declines to raise in opposition to a competing marriage actually proved."

The authorities in fact do not tend to sustain the position of the plaintiff. I am constrained therefore, from the evidence adduced, to hold: (1) That these relations, in their origin, were illicit; (2) that there was an unfulfilled promise of a later ceremonial marriage; (3) that no specific common-law contract of marriage was ever consummated; (4) that the plaintiff was free to make her election and end the relationship; and (5) that she clearly exercised this prerogative when she married Walsh. The plaintiff is not a victim of circumstances; she is a woman unusually self-willed and intelligent, not innocent and weak. She has so cast her life that now this court cannot afford her relief. In good faith, as she has testified, she entered into a valid ceremonial marriage, and she must abide by it. As was said in the recent case of Schaeffer v. Schaeffer, 160 App. Div. 48, 144 N. Y. Supp. 774:

"Marriage is yet a status, on which depends the idea of a family, and on which * * * has arisen the structure of civilization as we know it."

The complaint is dismissed, without costs. Judgment for defendant dismissing complaint.