POLICE COURT—VILLAGE OF MALONE,

July 16, 1914.

## THE PEOPLE v. JAMES DENNEY.*

DISORDERLY PERSON—HUSBAND AND WIFE—CRIM. CODE, SEC. 899—RE-
MARRIAGE AFTER FIVE YEARS' ABSENCE.

Where a wife, whose husband has been absent five years does not
use ordinary prudence to find out whether her husband is still liv-
ing, she enters into a second marriage at her peril, and while a
police court cannot adjudge a voidable marriage to be void where
the only question before it is whether the complainant is the wife
of the second husband it will not sustain a proceeding of a criminal
nature to compel such husband to support wife under sub. 1, sec.
899 of the Criminal Code.

*M. T. Scanlon*, for the People.

*A. B. Cooney*, for the defendant.

BIGELOW, P. J.:

This is a proceeding of a criminal nature to compel the de-
fendant to give security that he will support the complainant,
who claims to be his wife, and alleges that he is a disorderly
person within the intent and meaning of subdivision 1 of sec-
tion 899 of the Criminal Code.

The unusual thing about this case is that there are two men
now living, to each of whom the complainant has been married
by a conventional ceremony, and from whom she has never
been separated by the dissolution or annulment of either mar-
riage. I am not aware that just such a case has ever before
been brought in a Police Court of this state.

---

* See People v. Dauchy, 27 N. Y. Crim. 14. See also People v. Racy-
kowski, 29 N. Y. Crim. 533.

The defendant Denney does not deny that he has abandoned the complainant, and he now absolutely refuses to make any provision for her support, claiming that she is not his wife. This, then, is the only question before us; do these parties now sustain to each other the marriage relation?

The complainant Mary claims that at the time she married Denney (August 4, 1904) she honestly believed that her former husband Louis Burrell, whom she married in 1889, was actually dead, and that she had not known him to be alive for about ten years.

The law, as I understand it, applicable to the case is this: A man or woman whose former husband or wife has continubusly absented himself or herself for five succeessive years, who honestly believes him or her to be dead, and who has made diligent and impartial inquiry in good faith to ascertain whether or not he or she is still living, using all the means and efforts which a person of ordinary prudence, realizing the importance of the investigation, would use, may marry again, and is not only protected from prosecution for bigamy, but such second marriage, until it is declared void by a court of competent jurisdiction, will protect the legitimacy of children born under it, and will clothe the parties thereto with all the rights and subject them to all the duties of husband and wife respectively.

Let us carefully examine the law, the statutes, and the decisions.

"A marriage is absolutely void if contracted by a person whose husband or wife by a former marriage is living, unless * * * * * * such former husband or wife has absented himself or herself for five successive years then last past without being known to such person to be living during that time." Domestic Relations Law, section 6.

"A marriage is void from the time its nullity is declared by a court of competent jurisdiction, if either party thereto

* * * * * * has a husband or wife by a former marriage living, and such former husband or wife has absented himself or herself for five successive years then last past without being known to such party to be living during that time." Domestic Relations Law, section 7.

If we must construe these statutes literally, then the mere fact that complainant did not know that her first husband was living at any time during the five successive years of his absence just before her second marriage, would justify that marriage even though she might have deliberately labored to prevent herself from learning the truth.

But the highest court in this state has twice at least taken a different view.

In construing the former statute, which was substantially the same as above quoted, the Court of Appeals, speaking through Judge Vann, says,—

" The section quoted seems to be based upon the probability that the absentee is dead, and is apparently designed to protect the person who, in good faith, acts upon the statute, from evil results, if the absentee is actually living. The first marriage is suspended, or, as was said in Griffin v. Banks (24 How. 213) it is " placed in abeyance " but it is not reinstated by the return of the absentee, because the second marriage becomes void only from the time that it is so declared by a competent court. Otherwise both marriages would be in force at the same time, and to this extent, polygamy would be sanctioned by law. The first marriage ceases to be binding until one of the three parties to the two marriages procures a decree pronouncing the second marriage void. A statute with such possibilities should be so construed as to promote good order, and the person availing himself of its privileges should be required to act in perfect good faith. He decides the question as to his right to marry for himself, without any application to any court or public authority. The whole re-

sponsibility rests upon him. He cannot shut his eyes and ears and justify a second marriage because for five years he did not hear of his wife.

Did he honestly believe she was dead? Did he make inquiry? Were the circumstances such that, a reasonable man, honestly desiring to learn the truth, would have made inquiry? Was he excused from inquiring by a false report of her death? Questions of this character are involved in the ultimate question of good faith, which is necessary for the jury, as it depends upon the inferences to be drawn from a great many circumstances." Gall v. Gall, 114 N. Y. 120.

In 1910, Judge Vann again writing the opinion of the same court in the case of Stokes v. Stokes (198 N. Y. 305) speaking of a similar second marriage, says,—"If she knew, or should have known, the fact at the time, it was absolutely void with no binding force, and their relations were not sanctioned by law, whether they realized it or not." "For knowledge within the true meaning of the statute involves all that a person of ordinary prudence would have discovered under the circumstances by an inquiry conducted in good faith with the diligence required by the importance of the subject. The inquiry must be made with an honest effort to find out the truth, not to overlook it so as to be able to testify that nothing was discovered. A careless or dishonest inquiry affords no protection."

If, therefore, the complainant has fully complied with all these requirements of the law as I have stated them before quoting the statutes, she is entitled to an order requiring the defendant Denney, to give bonds for her support, for the law is that the former marriage is held in abeyance or suspended until the second marriage is set aside.

There is considerable conflict in the evidence before us, and much of it tends to disprove the complainant's claim that she acted in good faith, and even to show that within five years before she married Denney, she was actually informed that Burrell

was still alive, but as some of the defendant's witnesses appear to evince hostility towards her, I prefer not to give too much weight to their testimony,.and to decide this case upon the complainant's own evidence, with only a few other matters proved by the defendant, which are conceded to be facts.

The complainant's maiden name was Mary Durant. She married Louis Burrell, who then lived at Altona, N. Y., and from that time lived with him at Bangor, N. Y., a place about five miles from Malone, until the 9th of March following, when he abandoned her there, but about four years later he returned and stayed at her house for some four weeks. This was about 1894, and from that time forward the complainant has never seen him until three weeks ago, when she found him at Lacolle, Canada, and had a talk with him in a law office.

About six years after Burrell's final departure and four years before she married Denney, one Mary Bushey told the complainant at Bangor that she had read in a newspaper, the name of which she had forgotten, but which she thinks was a Malone newspaper, that Louis Burrell of Altona was dead. According to the complainant and Miss Bushey it was the general talk at Bangor that Burrell was dead. The complainant could not read or write, but she had passed her girlhood in Altona where Burrell resided when she married him; she had a sister there whom she visited, as she says, " three or four or five or six years," and she knew that Burrell had relatives living in that place. But notwithstanding all these facts and that Altona is only forty-one miles from Bangor, she never went there for the purpose of making inquiries, and never hunted up his relatives there to ask them where Burrell was, and if the report of his death was true. On the contrary she contented herself with asking questions regarding the matter of various persons in Bangor, none of whom were related to him, and none of whom, so far as appears, would be likely to know anything as to what had become of him. But though she never went to Altona

for the purpose of making inquiries, she did go there about two years after she heard the false report of Burrell's death, and two years before she married Denney, and was there visiting, but making no inquiries, at the time her house in Bangor was burned.

From this time until her marriage to Denney, she appears to have lived in Malone, which is but thirty-six miles from Altona. Is this the way that a person of ordinary prudence would have acted in a matter of so much importance to her? If she really wanted to know the truth, would she not have gone thirty-six miles to a place which she was familiar with from childhood, and where she had a sister living, and where she knew Burrell had relatives living, and have made some inquiries there? And when she was actually in Altona, would she not have been certain to make some such inquiries?

These questions answer themselves. The complainant did not make such an investigation as the law required of her before she married Denney, and she entered into this second marriage at her peril. Burrell is still alive, and if the complainant had used ordinary prudence she almost certainly would have found it out before she married the defendant.

The defendant is therefore not her husband, for this marriage to him is not valid, nor merely voidable, but being void in its inception, is now absolutely void, and the defendant must therefore be discharged.

Of course a police court cannot, in a direct proceeding for that purpose, adjudge a voidable marriage to be void, but in a case like this the magistrate is compelled to decide whether or not the complainant is the wife of the defendant, and consequently must decide whether the marriage relied upon as binding upon him was valid, void, or voidable, for that is the only issue before him.

The defendant is therefore discharged.