MARJORIE E. CAVANAUGH, Plaintiff, *v.* LEWIS J. VALENTINE et al., Constituting the Board of Trustees of The Police Pension Fund of the City of New York, Defendants.

Supreme Court, Special Term, Kings County, March 25, 1943.

*Henry Gallop* for plaintiff.

*Thomas D. Thacher, Corporation Counsel,* for defendants.

CUFF, J. This is an action for a declaratory judgment. Plaintiff seeks to have her status established as the lawful widow of Thomas F. J. Cavanaugh who, until his death, was a lieutenant in the Police Department of the City of New York and, in that capacity, plaintiff petitions to be declared entitled to the pension which accrues to such widows. The defendants are the persons who compose the Board of Trustees of the Police Pension Fund of the City of New York. They have rejécted plaintiff's application for the pension on the ground that she failed to prove that she had been the lawful wife of Lieutenant Cavanaugh. Plaintiff rested her claim on a common-law marriage. The disturbing factor is that she had been a party to a previous marriage which had not been terminated by death or dissolution.

The salient facts of the early history of these people as testified to by plaintiff are: Plaintiff married by ceremonial wedding James Hill Ashton in 1910. She lived with him until 1917 when

he joined the military forces of the United States in World War I. In the spring of 1921 he left and has not been heard from since. In the latter part of 1923 plaintiff met Lieutenant Cavanaugh, who was then unmarried. In 1924 she and he sought a marriage license but were refused because plaintiff was unable to show that the Ashton marriage had terminated. They thereupon resolved to live together and did so openly, agreeing to tell their friends and relatives that they had been joined by a quiet church wedding. At the time she was thirty-seven and he thirty-eight years of age. They lived together continuously holding themselves out at all times as man and wife from that date until he died May 4, 1940, and since then she has carried on as his widow.

The question presented for decision is the validity of the common-law marriage to Lieutenant Cavanaugh.

It is plaintiff's contention that the conduct of her and the lieutenant over the years spell out that marriage. The defendants' view is that the lieutenant had not entered into the agreement of marriage and plaintiff knew that she could not, hence there was no common-law marriage.

The institution of common-law marriage obtained in this State until 1901. That year it was invalidated (L. 1901, ch. 339, § 6), only to be restored in 1908 (L. 1907, ch. 742, § 6, eff. Jan. 1, 1908) and to be outlawed once more on April 29, 1933 (L. 1933, ch. 606, amdg. Domestic Relations Law, § 11), which is its present state. As marriage is a contract protected against impairment of its obligations by the United States Constitution (art. I, § 10) the prohibitory legislative action referred to above affected only those common-law marriages attempted following the placing of the legislative ban upon them. In other words, common-law marriages in existence on April 29, 1933, remained unaffected by the enactment which took effect on that date. The law forbade such unions to begin therafter.

For the present discussion the effect of the Ashton marriage will be disregarded.

When, according to plaintiff, did her common-law marriage begin? She fixes the formal date as August 28, 1930. She testified, however, that she and the lieutenant began living together in a three-room apartment in September, 1924; that they continued in that apartment until 1925; that in that year plaintiff's mother gave plaintiff and her sister a house at 3065 Avenue R, Brooklyn, New York; that plaintiff and the lieutenant immediately took up residence there and lived continuously in those premises until his death fifteen years later; that

when a mortgage loan was obtained on that property the plaintiff and the lieutenant executed the necessary papers as husband and wife; that the house was a one-family building in which no one lived except plaintiff and the lieutenant; that no children were born, a fact which both regretted; that they visited among their friends, neighbors and relatives and were always known as, introduced as and held themselves out as man and wife; and that adhering invariably to that relationship they had attended social functions together, which included two overnight stays at American Legion Conventions.

Plaintiff points to records in the Police Department as some evidence showing the lieutenant was married to her:

(1) The '' Teletype '' (Exhibit 14) which was a communication sent from the 61st Precinct, to which the lieutenant at the time of his death was assigned, addressed to '' Commands Concerned '' on which appears the notation: '' Next of kin: — wife, Marjorie, 3065 Avenue R, Brooklyn.''

(2) Plaintiff's application executed before a Commissioner of Deeds, on December 24, 1940 (Exhibit 10e), wherein she swore that she was his widow and by which she sought to have delivered to her the pay which he had earned but had not received between April 30th, his most recent pay day, and May 4th, the date of his death, which salary was paid to plaintiff by the City of New York by check to her order dated January 6, 1941. Plaintiff indorsed that check '' Marjorie E. Cavanaugh '' and collected its amount, $98.57.

(3) A receipt (Exhibit 10b) signed by plaintiff running to the Treasurer of the City of New York for that check.

(4) A ''Payment Voucher'' (Exhibit 10f) prepared in the office of the Comptroller on the back of which the auditor of accounts certified that he had '' examined, audited, revised and settled this account '' and recommended payment to plaintiff. May not the inference be justifiably drawn that the auditor was satisfied by the Police Department records that the lieutenant was married and that his wife's identity conformed to the applicant's? It is likewise only reasonable to infer that any records, except those emanating from plaintiff, in the Police Department had been furnished by the lieutenant himself, because no other authorship of such information should have been acceptable. That auditor's certificate (Exhibit 10f) treated necessarily with two subjects: the amount due and the identity of the claimant. It would be loose auditing indeed if that official relied solely upon plaintiff's application to determine the important question that the proper person was advancing the claim; and

(5) That he had made her the beneficiary as his wife of his insurance in the Police Benevolent Association in 1934.

Plaintiff arranged for the lieutenant's entering Coney Island Hospital, where he died. She also attended to the details of his burial; greeted his friends and associates at the wake, attended the Requiem Mass in the role of widow, the chief mourner. The undertaker submitted his bill to her and she partially paid it by turning over to him the $488.35 police benefit insurance and $100 " Government check " which she had received. (See Exhibit 9.) There is no dispute that the records set forth in the last two paragraphs actually existed.

In addition to the foregoing, plaintiff testified that she and the lieutenant assembled their friends and some of her relatives at their home on August 28, 1930, the anniversary of his birth, and entertained them at a party; that during the evening the lieutenant acknowledged to all present that plaintiff was his wife and she made a corresponding statement respecting him; that this event and the latter incident had been pre-arranged in order to formally publicize their relationship; that it came about in this way: Plaintiff and her sister testified that at that time they had been discussing from time to time the fact that she and the lieutenant had not been married by cere-mony; that the lieutenant on occasion joined in the discussions; that the three in June or July, 1930, called upon the attorney for the plaintiff's family, whose office was at 44 Court Street; that they explained to him their relationship and the events leading thereto; that he recommended a proceeding in the Supreme Court to dissolve the Ashton marriage by reason of Mr. Ashton's long unexplained absence; that the lieutenant objected to that procedure saying that he would be drawn into it and that publicity would follow, which would embarrass him; that the attorney next advised the social gathering which was held on August 28, 1930, and the public acknowledgment of their married status thereat.

Plaintiff's sister substantiated plaintiff's testimony in numer-ous instances throughout the trial. She testified that it was at her home that plaintiff met the lieutenant in 1923. She said that she had always understood that there had been a ceremonial marriage until she was told to the contrary by plaintiff early in 1930 and that it was she who urged consulting the family attorney.

Another witness who gave testimony concerning the conduct of plaintiff and Lieutenant Cavanaugh toward one another was **Daniel S. Leahy.** He stated that he knew the lieutenant since

1929 having met him in American Legion circles. He met plaintiff with the lieutenant at the Legion National Convention at Boston in 1930 and again the following year at Detroit at a similar event. He testified that at all times they both held themselves out and were recognized by him and others as a married couple; that he always had understood by reason of his association with Lieutenant Cavanaugh that plaintiff was his wife.

Dr. Sisskind was plaintiff's physician. She introduced the lieutenant to him as her husband. The doctor said that he knew the couple about eighteen years; that over that period they were regarded as husband and wife by, and held themselves out as such to, all persons at all times when he was in their company or they were, or either of them was, being discussed.

No evidence of an affirmative character was offered in opposition to plaintiff's. The defendants put in evidence a blank form entitled " Report of Change of Residence or Social Condition " (Exhibit L) and point out that, although rule 184 of the Rules and Regulations of the Police Department required the filing of such a report by a member of the Police Department who changed his social status from single to married, that report was not filed by Lieutenant Cavanaugh. Defendants wish the court to infer from the absence of such a report in the police records that that is evidence that Lieutenant Cavanaugh continued to regard himself as single. The Police Rules and Regulations are not before the court because they were not offered in evidence. Assuming nevertheless that rule 184 is similar to the directions on the blank entitled " Notes," it is not clear that a marriage is required to be reported. No definition of " social condition " appears, but direction No. 4 provides: " Any change of social condition to include those occurring on account of death or legal proceedings, shall be reported." That language would not suggest that a marriage was intended to be a subject of report. The only evidence presented that the lieutenant did not file the change of " social condition " is that the defendants have not found it in the department files. There is no evidence to show that the lieutenant ever understood he was expected to report his marriage. He did report a change of address.

Defendants' evidence consists mainly of comment by the Corporation Counsel with respect to the contents of the papers filed by plaintiff upon her application for the pension in suit. The Corporation Counsel also alludes to the fact that plaintiff did not call as a witness the lawyer whom plaintiff testified she con-

sulted in 1930. That attorney could not have testified for plaintiff with respect to anything of importance. His advice would have been inadmissible as hearsay. It was not for the plaintiff to produce the attorney, it was for defendants to do so if his testimony would have been helpful to their defense, although plaintiff might have excluded it on the ground of privilege. The attorney's name and address were given; the case was adjourned from one day to the next. His office was nearby. He was available.

The status of the first marriage will be considered.

The marriage to John Hill Ashton took place in 1910. Plaintiff testified that she lived with him until 1917; that he joined the military forces at that time; that when he returned after the war he told her that he had been " gassed "; that thereafter while he was living with her he took various medicines; " every now and then " he would be confined to his bed; that he coughed constantly — " a dry cough " — ; that coughing grew more frequent and became " very bad "; that he bought a taxicab because, he said, he could not work indoors, that he had to be out of doors; that he drank whiskey every day and " got intoxicated "; that he stopped eating but kept on drinking whiskey up to 1921; that he refused to see doctors, saying that he knew that the doctors could not help him; that he talked often of taking his life, saying at times " I'm going to end it; " that in the spring of 1921, March or April — in the afternoon between one and two — he left the house; that at the time he left and at all times since they married she and Mr. Ashton had maintained their home together; that there were no children; that she never heard from him again; that she looked for him that evening and night; that the day after he left she consulted his partner in the taxicab business, one Rafter, who said that he had not seen him that day; that she saw the cab on the street where he used to " stand "; that it remained there all that day; that thereafter Rafter " worked the cab " alone, keeping all receipts; that after nine months she sold the cab to the partner; that at the time he left, the cab was registered in her husband's name; that it was not registered for the following year; that he never renewed his operator's license (information about the license and registration, plaintiff said, she obtained at the Motor Vehicle Bureau); that the day following his disappearance she reported his absence to the Police Department; that she also sought aid at the Bureau of Missing Persons; that she visited the morgue in Kings County and at Bellevue Hospital; that the police called " a few hospitals " for

her; that she received no information about him at any of the places mentioned; that she visited " cabarets " and other places which he used to frequent; that none of his friends or acquaintances had seen him; that she wrote to his brother in Canada; that he replied that he had not seen him or heard from him; that her husband had no other relatives; that she constantly inquired for him among his friends; that although she continued to live for a long time after he left at the address where they had had their home, and although her husband knew her sister, her father and mother and that they continued to live for many years following his disappearance at the address that her husband always knew as their home and had visited, neither she nor any of them ever saw or heard of or from him after his departure; that he had never left home before; that she knew of no reason why he wanted to avoid her unless it was his ill health and the burden that he had been because he was unable to earn substantially; that there had been no quarrel between her and him; that she believed that if he had continued to live after he left he would have returned to their home; and that she believed that he died prior to 1924.

The defendants argue that because of the undisposed of marriage of plaintiff and Mr. Ashton she and the lieutenant were never competent to enter into the relationship which plaintiff claims ripened into a valid marriage. It is the defendants' contention that the conduct of the two was meretricious and could not form the basis of a subsisting marriage. Their counsel ridicules the efforts expended to locate Mr. Ashton and he accords the same treatment to the August 28, 1930, gathering, on which occasion plaintiff testified her marriage was announced to her and his intimates. As will be indicated by this decision this court does not share those views.

There is the presumption " that a person who has been continuously absent from his home or place of residence, and unheard from or of by those who, if he had been alive, would naturally have heard of him, through the period of seven years, is dead." (*Butler* v. *Mutual Life Ins. Co.,* 225 N. Y. 197, 203; see, also, *Dunn* v. *Travis,* 56 App. Div. 317, 320.) According to *Matter of Katz* (135 Misc. 861, 871) the person seeking the adjudication of " legal death " must show that he had made a thorough and exhaustive search for the missing person, and *McCartee* v. *Camel* (1 Barb. Ch. 455, 463) holds that such search must be conducted where individuals are to be found who would be likely to know and tell the truth about the matter. The evidence is abundant that plaintiff in her search met that requirement.

These parties were competent to contract a common-law marriage between the spring of 1928 (seven years after the disappearance of Mr. Ashton) and April 29, 1933 (the date when common-law marriages were abolished). No common-law marriage could be established by them, however, until after the " legal death " of Mr. Ashton.

Upon whom rests the burden of proving the status of the Ashton marriage in this suit? The Corporation Counsel maintains that it is plaintiff's responsibility. That question is settled in this State. The burden of proving that a marriage is invalid because at the time it was contracted there existed a prior marriage is upon the party who essays to invalidate the second marriage. It is for that party to show that the first marriage was not terminated by death, annulment or divorce. (*Matter of Dugro,* 261 App. Div. 236, affd. 287 N. Y. 595.) That rule is applicable also where the second marriage is a non-ceremonial one. (*Davies* v. *Lehigh Valley R. R. Co.,* 261 App. Div. 854.)

The question of where the burden lies in this case is unimportant. The plaintiff assumed it. The defendants offered no evidence on the subject, relying upon whatever weaknesses cropped up in plaintiff's case.

What is the attitude of the courts in cases of this nature?

Sustaining a common-law marriage by a divided court in *Boyd* v. *Boyd* (252 N. Y. 422, 428), O'BRIEN, J., said: " The validity of any alleged common-law marriage is always open to suspicion. Especially is doubt justified when one of the parties is dead. Clear, consistent and convincing evidence is required to establish the fact. This natural suspicion must, however, be dispelled when testimony, if reasonably believed, proves the existence of circumstances inconsistent with the absence of the alleged marriage."

" A common law marriage ", said HUBBS, J., in *Matter of Haffner* (254 N. Y. 238, 242) " is not required to be proved in any particular way. It is sufficient if the evidence establishes that legally competent parties *in præsenti* intended to become husband and wife and thereafter lived and cohabited as husband and wife." And further in the same case (p. 243) that learned jurist said: " Courts should not be solicitous to nullify such intent and decree the relation which they believed lawful to be unlawful and void. [Citing cases.] "

*Matter of Haffner* (*supra*) had elements much like the case at bar. At the time the couple commenced to live together as man and wife (there was a ceremonial marriage) the husband

was married to another woman. Thereafter the latter died. The couple continued to live as man and wife for five more years when one of them died. That common-law marriage, which began upon the death of the husband's first wife, was sustained, although, as is contended by defendants in this case, when the parties began living together their relationship had no legal or moral sanction. The holding was different in *Matter of Hill* v. *Vrooman* (242 N. Y. 549). But that decision was based upon the fact that the couple when they started cohabiting, and for a long period, knew that they were incompetent to contract any kind of marriage. Every semblance of good faith was lacking. The removing of the impediment of the outstanding spouse by death was ineffectual to validate their marriage although they continued to live together as man and wife as they had done before the death, because they performed no " affirmative act or declaration or any ceremonial marriage." (Quotation is from the Reporter's statement of facts; there was no opinion.) In *Gall* v. *Gall* (114 N. Y. 109) the relations of the couple began illicitly. Later the man recognized the woman as his wife and her child as his. The court held that a common-law marriage came into being following that recognition.

It would seem that the court has accepted the testimony of plaintiff's witnesses at face value. That is the fact. This court considers plaintiff and her sister truth-telling women and wholly reliable. Mr. Leahy likewise gave the appearance of and answered questions as one worthy of belief. Dr. Sisskind, who was not even cross-examined, produced a like impression.

The Corporation Counsel takes a different view. He questions the veracity of plaintiff, her sister and Mr. Leahy although he made no comment upon Dr. Sisskind, whose testimony standing alone would have gone a long way toward establishing plaintiff's relationship to Lieutenant Cavanaugh. There was one incident in plaintiff's conduct which merits comment. On May 22, 1940, she filed an application (Exhibit A) with the Police Department for the pension in suit. She represented therein that she had never been married before and that her maiden name was " Marjorie E. Delaney." Both statements were untrue. She failed to swear to the application although the defendants' representatives urged her several times to come in and complete her claim. Her attitude should not be condoned, but it is understandable. The Ashton marriage had destroyed her ambition to marry Lieutenant Cavanaugh in 1924 when she admitted it before the marriage license clerk and as a consequence was refused a license. At the time she filed the applica-

tion just referred to, Lieutenant Cavanaugh was gone. She had no income; the pension was at her fingertips; the question about any prior marriage revived the Ashton affair but only to haunt her; she might lose the pension if she admitted it, and she could not afford that. She attempted to conceal the first marriage, but she was too decent to carry out the prompting to do wrong so she omitted the oath. The paper was a nullity. That act on her part should not condemn her as a perjurer. It was a mistake, which she corrected.

By their acts and reputations over many years and by public statements, plaintiff and the lieutenant established their relationship as man and wife. The date of their marriage is unimportant, as long as it was subsequent to the " legal death " of Mr. Ashton. The court makes the following findings:

(1) That Mr. Ashton disappeared in the spring of 1921, under circumstances which indicate that he died immediately thereafter;

(2) That plaintiff made diligent and exhaustive search for him without avail;

(3) That plaintiff and the lieutenant commenced to live together as man and wife in 1924, believing, at the time that they entered upon that life, that plaintiff's husband was dead;

(4) That they continued to live together in that relationship without interruption openly and in good faith until the lieutenant died, May 4, 1940;

(5) That on August 28, 1930, at a formal gathering of friends and relatives, plaintiff and Lieutenant Cavanaugh publicly acknowledged their marital relationship;

(6) That plaintiff was the lawful wife of Lieutenant Cavanaugh until his death and now is his lawful widow, entitled to the pension, the subject of this suit.

Judgment with costs will be entered in favor of plaintiff.